IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

ANGELA LOCHNER,

                          Plaintiff,                    OPINION AND ORDER

    v.

                                                  19-cv-878-wmc

WISCONSIN DEPARTMENT OF
AGRICULTURE, TRADE, AND
CONSUMER PROTECTION,

                          Defendant.

       Plaintiff Angela Lochner brings this wage discrimination claim against her employer, the State of Wisconsin Department of Agriculture, Trade, and Consumer Protection ("DATCP"), under the Equal Pay Act of 1963, 29 U.S.C. § 206(d).  Specifically, Lochner alleges that DATCP wrongfully discriminated against her on the basis of sex by repeatedly denying her Discretionary Equity or Retention Adjustments and granting higher starting salaries to less senior, male employees under its so-called "broadbanding" pay structure.  Before the court is DATCP's motion for summary judgment in its favor on an affirmative defense that any pay discrepancies within Lochner's job classification are due to factors unrelated to sex.  (Dkt. #13.)  However, as explained below, because DATCP has failed to provide sufficient evidence to preclude any reasonable jury from deciding for Lochner on that defense, for which it bears the burden of proof, the court must deny the motion.

UNDISPUTED FACTS[1]

**A. Lochner's Employment at DATCP**

Plaintiff Angela Lochner is, and was at all times relevant to this case, a State of Wisconsin employee in the classified civil service. Lochner began work at DATCP on January 13, 2014, as a Meat Safety Inspector Entry-level position in DATCP's Division of Food Safety. The parties agree this original start date -- January 13, 2014 -- became Lochner's official "seniority date" as the beginning of her continuous state employment. On November 1, 2015, Lochner moved to a Weights and Measures Petroleum System Specialist ("WMPSS") entry level position in DATCP's Bureau of Weights and Measures.

Just as its name suggests, the Bureau ensures compliance with Wisconsin's weights and measures, but it also enforces fuel quality and petroleum and hazardous material storage tank laws. As such, the Bureau's responsibilities include device inspection, storage tank inspection, fuel sample testing, and device calibration. In her position as a WMPSS (sometimes also referred to as an "inspector"), Lochner typically performs petroleum storage tank inspections, fuel sampling, examination of small and medium capacity scales, packaging checks, price verification, and retail motor fuel devices inspection. Her role may also include additional specialty assignments and investigating complaints. Because of the overall quality of her inspections, Lochner's peers and DATCP supervisors hold her in high

---

[1] For the purpose of summary judgment, this court finds these facts undisputed and material, except where noted. All facts are drawn in the light most favorable to the plaintiff, as the nonmoving party.

regard. Lochner also recently received an "exceeds standards" for overall performance rating.

Historically, a higher ratio of male employees to female employees filled the WMPSS positions in Wisconsin. Overall, there are also still fewer female applicants than male applicants when jobs are available in the Bureau.

### B. Pay Structures and Broadbanding Generally

All DATCP employees entering classified service are hired into a specific position, which is subject to a set pay schedule and range according to its unique classification. Generally speaking, the State of Wisconsin's Compensation Plan, Statutes and Administrative Code govern payment to State of Wisconsin employees in the classified service. More specifically, state agencies, including DATCP, use the information from the Compensation Plan to account for salary adjustments as part of preparing operating budgets, which requires consideration of class pay progression adjustments, market or parity increases for specific classes, compensation provisions for reclassifications of positions, etc. The Compensation Plan is itself updated over time by the Wisconsin Department of Administration ("DOA").

Along with setting pay schedules, the Compensation Plan includes specific guidance for increasing employee salaries. Before the State of Wisconsin's implementation of "broadbanding" in 2001, there were multiple levels (or steps) *within* a classification series, which were distinguished by number or skill level description. Under the old Compensation Plan, employees who were reclassified upward to a new step within a classification series could expect a salary increase.

3

Broadbanding is intended to eliminate these steps within a classification, collapsing a group of pay ranges into a single "band." At the same time, instead of a single minimum rate within a classification, broadbanding allows more flexibility with starting salaries, so that agencies can now offer a dollar range to talented prospects that meet relevant factors, including competition from the private labor market. Accordingly, under Section I—4.04(2)(a) of the Compensation Plan, once a classification has been broadbanded, the agency possesses the discretion to set a starting salary at "any rate that is not less than the minimum of the applicable pay range and not greater than the applicable appointment maximum." (Def.'s PFOFs (dkt. #17) ¶ 50.)

Under this broadbanded structure, salary increases changed as well. Two methods are now available to employees at the application of a supervisor: Discretionary Merit Compensation ("DMC") and Discretionary Equity or Retention Adjustment ("DERA") awards. DMCs award a lump sum to the designated employee, but do not increase base hourly wage. By contrast, DERAs provide a "permanent increase to an individual's base hourly compensation." (*Id.* ¶ 64.) The agency regards DERAs as a mechanism for employee economic recognition to remedy: (1) pay equity addressing unjustified differences between state employees or pay compression; or (2) retention needs by addressing competition, particularly from the private labor market for valuable employees.. Specifically, Section I—6.00(h) of the Compensation Plan states that "Equity DERA"

> will only be approved if the employee's salary has been determined to be lower than that of other state employees performing the same or similar duties at the same level of proficiency and who have comparable years of state service or if there is a significant pay compression between the employee and the subordinates supervised.

4

(*Id.* ¶ 65.)  Similarly, the "Retention DERAs" are authorized under the Compensation Plan "only . . . if the employee has a job offer in hand and the resultant loss of the employee's knowledge and experience would be a detriment to the agency." (Pl.'s Add'l PFOFs (dkt. #21) ¶ 1.)  Whether for equity or retention purposes, a DERA grant amount is based on the Within Range Pay Step ("WRPS") per fiscal year, subject to the maximum of the pay range.  Ordinarily, eligible employees may be granted a DERA of up to 4 WRPS per fiscal year, although supervisors can request up to 6 WRPS in "exceptional circumstances." (*Id.* ¶ 3.)  Agencies also have discretion to develop their own administrative procedures for DERA grants, following guidelines from the Administrator of DOA's Division of Personnel Management, that must be "applied in a uniform manner throughout the agency or employing unit." (*Id.* ¶ 2.)

According to the DOA, DMCs and DERAs are now crucial tools for agencies because broadbanding often causes pay compression.  In particular, compression now occurs when newer staff are paid similar to or higher than long-term staff.  However, DMCs and DERAs are in short supply.  For example, in April 2019, the DOA would only accept from DATCP the submission of DMC awards for 15% of its eligible Full Time Equivalent ("FTE") Employees, which equated to 95 DMCs; and for the submission of DERAs, 5% of all broadbanded FTE positions, which equated to 27 DMCs.  This amount is a fraction of the agency's 625-650 employees.

Along with DMCs and DERAs, two other mechanisms exist for increasing an employee's salary.  The Compensation Plan also authorizes "market or parity" salary increases for certain classifications.  Distributing market or parity dollars can be at the

discretion of the agency or mandated by the Compensation Plan. A wage increase also accompanies being promoted from "Entry" level to "Senior" level in WMPSS. The typical increase was the greater of 8% of the new pay range minimum, or the minimum of the pay range. However, Section I—4.09(2) provided that the agency could request a reclassified employee to receive up to 12% of the new pay range minimum.

### C. Implementation of Broadbanding in DATCP's Bureau of Weights and Measures

DATCP's Bureau of Weights and Measures implemented broadbanding for the Weights and Measures Petroleum System Specialist or WMPSS classification in February 2016, significantly increasing the pay range that could be offered to new employees. Before broadbanding, the pay range for the WMPSS-Entry class was $20.241 to $34.613 per hour. Afterwards, the pay range expanded from $19.19 to $51.69, encompassing both entry and senior level positions. That minimum also changed twice, to $19.58 on January 24, 2018, and to $19.98 on January 6, 2019.

With a few exceptions, post-broadband hires for the WMPSS classification have been hired at between $24.00 and $26.00 per hour. As a result, *every* WMPSS hired after February 7, 2016, had a higher starting salary than every employee's starting salary hired before that date. These starting pay rates were determined following the "division" management's evaluation of a candidate's relevant work experience, training and education, and other factors, including: pay rates of staff in the same job title and their relevant experience/training, internal budgeting, labor market data, prior positions in state

employment, and any other relevant factor.[2] The next step required human resources staff to review data, including: current staff wages, experience identified in past hires as important to the division, the pay range identified in the job announcement, whether it was an internal transfer/promotion or a new state service hire, etc.[3]

In light of the change to broadbanding in 2016, a number of the Bureau of Weights and Measures employees became frustrated with wage differentials. Specifically, they complained that broadbanding caused new employees to start with higher salaries than those hired before broadbanding took effect, including more senior employees within the Bureau. This pay compression and perceived inequities caused many employees to become upset, prompting human resources to offer mitigation strategies to staff. Nevertheless, DATCP viewed broadbanding as an important tool, particularly in light of its need to compete with municipalities paying higher salaries in hiring for the Weights and Measures classification.

### D. Lochner's Requested Wage Adjustments

On January 13, 2014, when Lochner began work as a Meat Safety Inspector-Entry

---

[2] Plaintiff contests the phrases "division management," "candidate," and "other relevant factors" as vague. (Pl.'s Resp. to Def.'s PFOFs (dkt. #20) ¶ 76.) While the court notes the objection, and assumes by "division," defendant is referring to the Bureau of Weights and Measures, any dispute over these terms is not material to the outcome of the motion for the reasons explained below.

[3] Plaintiff also disputes this fact on the basis that Rachelle Miller, upon whose testimony defendant relies in offering this proposed finding, (1) has not provided a basis for her personal knowledge of what HR staff did in these situations, (2) did not identify the "HR" staff described, and (3) did not share which particular hires are included in her description. (Pl.'s Resp. to Def.'s PFOFs (dkt. #20) ¶ 85.) In light of Miller's experience as section chief and Bureau Director, the court finds that she has an adequate basis to understand the HR decision-making process. Regardless, this dispute is also not material to the outcome of the motion.

Position in the Division of Food Safety in the DATCP, she belonged in the range 05-14 of the nonbroadband pay schedule with her pay set at $18.526 per hour. On November 1, 2015, following her promotion to the Weights and Measures Petroleum Systems Specialist-Entry position her pay increased to $20.34. Under this Compensation Plan, her pay equaled her prior compensation as a Meat Safety Inspector-Entry level plus 8% of the minimum offered for the new position, $20.25 (here, an increase of $1.62). On May 14, 2017, Lochner gained a promotion to a Senior Level Weights and Measures Petroleum Systems Specialist. As a result, under the same 8% increase algorithm, her salary increased to $21.88 per hour, effective on May 14, 2017. Then, after the DATCP Division of Trade and Consumer Protection obtained permission under the broadbanding system, Lochner's salary ultimately increased to 12% of the new minimum WMPSS position -- the highest available under the new Compensation Plan. That increase resulted in her being paid $22.65 per hour.

On April 12, 2018, Stephen Peter, DATCP's Bureau of Weights and Measures Field Supervisor, nominated Lochner and three other employees to receive a DERA. In Lochner's pay adjustment in particular, Peter described his trust in her as a trainer for new inspectors, highlighting that she had "rapidly become the most detail oriented inspector" under his supervision and lamented that she "had the misfortune of being hired shortly before the WMPSS position broadbanding and inspectors hired shortly after her started at a wage significantly higher." (Pl.'s Add'l PFOFs (dkt. #21) ¶ 17.)

After reviewing Peter's nominations, Alison Scherer from DATCP's Human Resources submitted a DERA request to the DOA on May 9, 2018, for Lochner, as a

8

Senior-level employee, along with a separate request for Jonathan Petzold, an Entry-level employee. With regard to each, Scherer requested the same $3.35 per hour, DERA increase in their respective base pay, explaining:

> Due to the implementation of broad banding in the Weights & Measures Petro. System Specialist series approximately 2 years ago, new hire rates of pay are exceeding that of previously hired and long term staff. The additional equity DERA for staff will allow the Weights & Measures Program to begin providing increased pay to longer term staff with more years of service, both within the state as well as within the program itself.

(Def.'s PFOFs (dkt. #17.) ¶ 120.) In Lochner's case, this DERA increase would have taken her $23.40 per-hour base pay to $26.75 per-hour. Scherer had a discussion with Rachel Martin from DPM about Lochner's moving her ahead of more senior staff (as measured in years of experience). Specifically, DPM expressed concern about Lochner's four years of state service relative to the high DERA amount requested (5.78 of the 6 total potential steps). Although Scherer emailed Martin the next day, May 11, summarizing the view of division management that Lochner's high level of performance, exceeding other staff, justified the increase, DPM ultimately denied a DERA for Lochner, citing the fact that her salary would have been higher than 13 staff with more seniority than her, while correcting inequities with respect to only two employees.

By contrast, DPM approved the DERA requests for the other two employees recommended by the Bureau of Weights and Measures, Petzold and Steven Hailer, both of whom are senior to Lochner. Specifically, Petzold is a WMPSS Petroleum Inspector-Entry, whose seniority date is October 23, 2003, due to his previous work as a Correctional Officer, Recreation Leader, and Probation and Parole Agent until he joined WMPSS on

9

October 18, 2015, had over 10 years of seniority compared to Lochner (whose seniority date is January 13, 2014). As approved, the DERA increased his salary 6 steps from $21.00 per hour to $24.48 per hour. As for Hailer, as a WMPSS-Senior, his seniority date is December 6, 1999, and his salary increased from $24.41 per hour to $26.50 per hour after the DERA request was approved. In fact, the eight men who received the DERAs as WMPSS had seniority dates ranging from 1993 to 2011, and, as a result of the DERA effective on May 26, 2019, had wages that ranged from $26.32-$28.41. Apparently, during this period, Alison Scherer, the HR Manager from May 2014 through June 2019, then-DATCP Administrator Lara Sutherlin, Bureau Director Rachelle Miller, and HR Program Officer Holly Weber, all decided seniority should take precedence for requesting DERAs.

Despite not receiving the DERA, Lochner's pay has not been static, changing on the following dates for the following reasons:

- February 18, 2018, market adjustment to $23.40
- June 24, 2018, general wage adjustment to $23.87
- January 6, 2019, general wage adjustment to $24.35
- December 22, 2019, market adjustment to $26.41
- January 5, 2020, general wage adjustment to $26.94

Each of Lochner's general wage adjustments equaled 2% of current base pay. The February 2018 market adjustment was part of an across-the-board $0.75 increase for all Weights & Measures inspectors. With regard the December 2019 market adjustment, the increases were allocated to employees with 10 years or less of state service seniority up to the highest

pay rate that could be given under the Compensation Plan.[4]

On April 17, 2019, Lochner's direct supervisor, Gregory Loreck, also nominated Lochner for a $2.40 DERA or, in the alternative, a $2,000 DMC. In support, Loreck explained that she was "'a highly productive inspector with a wealth of knowledge that she enthusiastically shares with many other inspectors, often training new inspectors that are making significantly more than she.'" (Pl.'s PFOFs (dkt. #17) ¶ 27.) Lochner received a $2,000 DMC award on June 4, 2019. As of her January 5 general wage adjustment, Lochner's wage now exceeds a few employees with more seniority -- Kevin McCarthy's and Nathan Torpen's by $0.43 and Joe Schrieber's and Joe Saladino's by $0.22.

### E. Post-Broadbanding Employees Credentials and Pay

Following the implementation of broadbanding, DATCP hired the following individuals into WMPSS Classification positions: Shawn Suri, Edward Sindelar, Michael Dailey, Chad Brockman, Jason Karczewski, Lance Smithey, Anthony Hoffmann, Jacob Schaefer, Daniel Lindert, Nicholas Eberle, Joel Burdick and Joel Uminski.[5] All of these employees were hired at starting salaries ranging from $23.00-$26.00 per hour, each of which exceeded Lochner's current wage at the time of their hire. In fact, this trend persisted even after she was promoted to WMPSS-Senior on May 14, 2017. For example,

---

[4] While plaintiff disputes that the December 22, 2019, market adjustment amount was the highest that could be provided, the court concludes that Stacey Davidsaver, DATCP's HR Manager, has adequate experience to offer this testimony. (Pl.'s Resp. to Def.'s PFOFs (dkt. #20) ¶ 167.)

[5] Though mentioned here for completeness, plaintiff does *not* contest Edward Sindelar's higher pay rate, recognizing that by transitioning from an Environmental Engineering Specialist Advanced 2 to WMPSS Entry, he actually took a $5.50 per hour pay cut.

on August 19, 2019, as a Senior level employee Lochner made $24.35 per hour, while Uminski was hired in at $25.25. Not only did Lochner's seniority date exceed these employees' seniority date by anywhere from two to five years at the time of their hires, but those individuals with less seniority than she had in 2019 (5.9 years), such as Burdick (4.4 years), Suri (3.7 years), Brockman (2.8 years), Karczewski (2.4 years), Smithey (1.6 years), and Eberle (0.7 years), were still making more per hour, even after Lochner received a market adjustment of $2.06 based on the 2019-2021 Compensation Plan which raised her pay to $26.41.[6]

As previously discussed, DATCP now hires under the broadbanding system by evaluating "work experience, training, and education, along with other factors including pay rates of staff in the same job title," and it justifies the wages paid various employees at issue here for different reasons, including prior relevant work experience, petroleum work noted specifically, work as a Limited Term Employee ("LTE") in the WMPSS classification before full time hire, and promotion from different classifications. Indeed, with the exception of Suri, Karczewski and Uminski, for whom no hiring wage explanation was provided, all of the named employees above fit into one or more of these justifications: Smithey brought four years of experience in the petroleum industry to the position; Lindert worked in the aircraft maintenance field for more than 25 years prior to his hiring, which comprised working with storage tanks and scale verification (each of which are

---

[6] Defendant objects to these proposed findings of fact as immaterial because the listed individuals were hired after broadbanding, which would explain the pay discrepancy. (Def.'s Resp. to Pl.'s Add'l PFOFs (dkt. #25) ¶ 39.) Since this objection goes to the heart of the parties' dispute, the court takes up below.

12

valuable skills for the WMPSS position); Eberle, Dailey, and Schaefer were former LTEs; Eberle and Schaefer shared an additional skill of tank system inspector training, which the current Bureau Director, Rachelle Miller, estimates put them a full year ahead of other candidates because of the time intensiveness of this training. In addition, Schaefer negotiated for his ultimate starting wage of $25.00 per hour based on his performance in a former LTE role, in which he had shown a "high level of autonomy" despite its technical complexity. Similarly, when Eberle was hired with comparable skill as Schaefer, he was offered the same current pay rate (at that time, $25.25) for consistency. Finally, Burdick was hired into the WMPSS class as a promotion from a different class, and both Hoffman and Brockman brought practical experience to the position.[7]

OPINION

The Equal Pay Act prohibits employers from discriminating:

> between employees on the basis of sex by paying wages to employees . . . at a rate less than the rate at which he pays wages to employees of the opposite sex . . . for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.

29 U.S.C. § 206(d)(1). In order to establish a prima facie cause of action under the Equal Pay Act, therefore, the employee "must demonstrate difference in pay for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." *Lauderdale v. Ill. Dept. of Human Servs.*, 876

---

[7] Hoffman worked as a weights and measures official for the five years prior to his hire, while Brockman had more than five years of "relevant weights and measures experience" and a bachelor's degree in a science field with two years of course work in chemical engineering.

F.3d 904, 907 (7th Cir. 2017) (internal quotation marks omitted) (citing *King v. Acosta Sales & Mktg., Inc.*, 678 F.3d 470, 474 (7th Cir. 2012); 29 U.S.C. § 206(d)(1)).

For purposes of summary judgment at least, defendant assumes that Lochner has met this prima facie showing: she was paid differently than male peers in WMPSS at the Senior and Entry levels; and "the senior level employees primarily had the same job duties, responsibilities, and working conditions." (Def.'s Reply to Def.'s PFOFs (dkt. #26) ¶ 12; Def.'s Opening Br. (dkt. #18) 3.) As a result, the burden shifts to the employer to prove a neutral factor that explains the salary discrepancies. *Lauderdale*, 876 F.3d. at 908.

Four neutral factors are set forth as affirmative defenses in the Act itself: "where . . . payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of product; or (iv) a differential based on any other factor other than sex." *Id*. (citing 29 U.S.C. § 206(d)(1)). Obviously, this fourth affirmative defense "is a broad 'catch-all' exception and embraces an almost limitless number of factors, so long as they do not involve sex.'" *Reiff v. Bd. of Regents*, No. 13-cv-192-jdp, 2014 WL 4546041, *3 (W.D. Wis. Sep. 12, 2014) (quoting *Fallon v. Illinois*, 882 F.2d 1206, 1208 (7th Cir. 1989)). Fundamentally, the Seventh Circuit "does not require that the factor other than sex be related to the requirements of the particular position in question, or that it be a 'business-related reason[]'"; instead, the question asked of the fourth defense is "whether the factor is discriminatorily applied or if it causes a discriminatory effect." *Fallon*, 882 F.2d at 1211.

Defendant seeks summary judgment based on this fourth affirmative defense, arguing that any pay differential within Lochner's UMPSS classification are due to factors

14

unrelated to sex, such as seniority and the broadbanding pay structure. However, a defendant must do more than suggest a potential, or even likely, reason for unequal pay. Rather, "[a]n employer's given explanation for a pay discrepancy must be supported by evidence that the employer *actually* relied on that reason." *Lauderdale*, 876 F.3d at 908 (citing *King*, 678 F.3d at 474) (emphasis added); *see Reiff*, 2014 WL 4546041, at *4 (requiring defendants to support the explanations for pay disparities "other than sex" with evidence). The parties in this case dispute whether defendant's affirmative defense was "actually relied on" when it made decisions within its discretion on entry wage amount and when making discretionary awards. *See Fallon*, 882 F.2d at 1211. Plaintiff further challenges whether broadbanding constitutes a compensation system that could explain pay discrepancies.

In its reply brief, defendant contends that plaintiff has failed to meet her burden of proof at summary judgment, citing to *Celotex Corporation v. Catrett*, 477 U.S. 317, 324 (1986), for the proposition that summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." (Def.'s Reply (dkt. #24) 5-6.) Defendant, however, bears the burden of proof on an affirmative defense in an Equal Pay Act § 206(d)(1) case. *See Corning Glass Works v. Brennan*, 417 U.S. 188, 204 (1974) (describing affirmative defense under Equal Pay Act as the burden of defendant to prove). As such, to obtain summary judgment on its defense that Lochner's pay differential is due to seniority, broadbanding or other factors unrelated to sex, DATCP "must lay out the elements of the [defense], cite the facts [that it] believes satisf[y] these

15

elements, and demonstrate why the record is so one-sided as to rule out the prospect of a finding in favor of the non-movant on the claim." *Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 601 (7th Cir. 2015).

Plaintiff principally relies on three actions in support of her discriminatory pay claim: (1) DATCP's grant of Jonathon Petzold's DERA salary increase in 2018 at the same time that her request was denied; (2) defendant's refusal to recommend her for a DERA in 2019; and (3) the higher wages paid to new, incoming employees. As to the first and second, while defendant explains the decisions not to award Lochner a DERA in 2018 and not to recommend her for one in 2019 as both due to "seniority," it provides *no* evidence that the DERA was granted to Petzold because of his seniority. *Fallon*, 882 F.2d at 1212 (requiring that the explanation was "actually relied on"). In fact, the actual, stated reason for Petzold's DERA as an Entry-level employee and Lochner as a Senior-level employee was the same: both had fallen behind less senior WMPSS employees at their respective levels due to broadbanding. Regardless, a dispute remains as to whether Petzold's grant or Lochner's denial is sufficiently explained by a "seniority system" to establish defendant's affirmative defense. At minimum, while granting Lochner a DERA may have raised her salary above individuals with more seniority than she had at the time, there is no dispute that new hires with less seniority -- and less experience -- were paid more than she was, thus calling into question whether defendant's reliance on a "seniority system" explains her pay differential.

As for plaintiff's third claim -- that she was paid less than new employees, a number of whom she trained -- defendant argues that the transition to broadband justifies the

16

higher pay needed to contend for top talent in the marketplace. As an initial matter, defendant does not need to justify its transition to broadband salary structures generally, whether done to meet market demands or based on other business judgments. *See Fallon*, 882 F.2d at 1212 ("It is not our province to second-guess employers' business judgment."); *King*, 678 F.3d at 473 ("[The Equal Pay Act [does not] require[] employers to ignore the compensation that workers could receive in other jobs, which in the language of the Equal Pay Act is a 'factor other than sex.'"); *Huggins v. City of Dayton*, No. 3:03cv300, 2008 WL 728432, *15 (S.D. Ohio, Mar. 14, 2008) ("[T]he burden is not so substantial as to require the Defendants to also provide market research supporting the city's policy decision behind instituting such a [broad band salary] plan.").

Still, defendant's evidence of the switch to broadbanding is not so one-sided as to rule out Lochner's sex as a factor in her pay differential with seemingly comparable WMPSS for at least two, core reasons. *First*, compensating new hires at a rate higher than Lochner was *not* mandated by the broadbanding system. Specifically, DATCP's decision to award new male hires higher starting salaries than Lochner's existing salary was not required by the minimum salary and ranges set by the broadbanding system. Even more specifically, defendant's general justification (broadbanding) for the higher rates awarded new male employees does not explain why the specific rates were required ($23.00-$26.00), particularly when the entire range allowed for $19.19 to $51.69 (and increased marginally over time). If anything, broadbanding permitted *more* flexibility and, in turn, more discretion with respect to salary decisions.

*Second*, even if broadbanding could somehow be construed as an immovable and uniform change in salary structure, defendant still must apply that compensation system in good faith *and* in a nondiscriminatory manner. *See Fallon*, 882 F.2d at 1212. To meet its burden on summary judgment, defendant must at least show (if not produce such one-sided evidence to require a reasonable juror to find) that higher salaries were actually necessary to compete for the new employees hired. For example, DATCP can show this by providing the evidence it actually considered of the market demand for the new employees' education, experience, or other qualifications. *See Drum v. Leeson Elec. Corp.*, 565 F.3d 1071, 1073 (8th Cir. 2009).

Certainly, defendant discusses the credentials of many of the incoming employees that support the proposition that the Bureau did, in fact, bring in talented individuals, including past work experience in a variety of relevant fields (such as petroleum, aviation, and familiarity with storage tanks), as well as relevant academic degrees. However, plaintiff contests *eleven* employees' higher wages, arguing they resulted from the impermissible exercise of discretion based on sex by the defendant after it moved to broadbanding, while defendant only describes evidence of how that discretion was exercised in a nondiscriminatory manner as to *eight*. Where defendant has not described the relevant factors as to three individuals (Suri, Karczewski, and Uminski), a jury cannot evaluate whether the higher salary rates were justified by reasons other than sex, much less were the result of responding to marketplace demand for pay above that offered to plaintiff. Because the record is incomplete on these facts, and a reasonable jury could find that impermissible factors like plaintiff's sex were involved in the decision-making process, the defendant has

not met its burden on this defense, and it has certainly not demonstrated the evidence of record is so one-sided as to rule out sex as a motivating factor for Lochner's pay differential, rather than just the application of broadbanding in "good faith and a nondiscriminatory manner." *Fallon*, 882 F.2d at 1212.

For this reason, Lochner's claim differs from the claim considered by the Seventh Circuit in *Lauderdale* where the evidence demonstrated that factors other than sex were properly and actually relied on by the Illinois DHS. In *Lauderdale*, the plaintiff claimed that her lower pay was the result of sex discrimination based on her assumption that the role of dual superintendent for both the Illinois School for the Visually Impaired (ISVI) and the Illinois School for the Deaf was paid less than the former male superintendent of ISVI alone. *Lauderdale*, 876 F.3d at 908. The court rejected plaintiff's argument that the defendant did not provide evidence that it actually relied on the Illinois CMS Pay Plan or budget concerns to make its compensation decision, because the record contained documentation and communication regarding the pay plan, and conversations expressing budget considerations. *Id.* at 908-09; *see also Reiff*, 2014 WL 4546041, at *4 (granting summary judgment to defendant where defendant "offered documented explanations for every pay adjustment received by Reiff and her comparators"). Here, no such concrete evidence is available as to at least three of the male entry level hires after broadbanding. On this record, therefore, the court cannot conclude that a reasonable jury could only find in defendant's favor on its affirmative defense.

ORDER

IT IS ORDERED that defendant the State of Wisconsin, Department of Agriculture, Trade and Consumer Protection (dkt. #13) is DENIED.

Entered this 1st day of February, 2021.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge