IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

ANGELA LOCHNER,

                            Plaintiff,

     v.

WISCONSIN DEPARTMENT OF
AGRICULTURE, TRADE, AND
CONSUMER PROTECTION,

                            Defendant.

OPINION AND ORDER

19-cv-878-wmc

Plaintiff Angela Lochner claims that her employer, the State of Wisconsin Department of Agriculture, Trade, and Consumer Protection ("DATCP"), violated the Equal Pay Act of 1963 ("EPA"), 29 U.S.C. § 206(d), by repeatedly denying her Discretionary Equity or Retention Adjustments and granting higher starting salaries to less senior, male employees under its so-called "broadbanding" pay structure. At summary judgment, Lochner met her prima facie burden of demonstrating that she was paid less than a male employee, so the case turned on whether DATCP could prove its affirmative defense that the difference in Lochner's pay to her male comparators was not due to sex discrimination, but rather was due to a seniority system or a differential based on any other factor than sex. (2/1/21 Op. & Order (dkt. #29) 14 (citing *Lauderdale v. Ill. Dept. of Human Servs.*, 876 F.3d 904, 907 (7th Cir. 2017); 29 U.S.C. § 206(d)(1).) Having identified three, material factual disputes that needed to be resolved, the court proceeded to hold a trial to the bench by Zoom on March 8 and 9, 2021, concerning this affirmative defense to determine whether: (1) defendant's grant of a Discretionary Equity or Retention Adjustment ("DERA") in 2019 to a male employee Jonathon Petzold was due to a seniority system or some other factor than sex; (2) defendant's decision not to recommend Lochner

for a DERA in 2019 was due to a seniority system or some other factor than sex; and (3) higher wages paid to new, incoming male employees based on broadbanding was due to some other factor than sex. (*Id.* at 18-19.) Based on the conclusions explained below, the court now holds that defendant has proven its affirmative defense under § 206(d)(1) by a preponderance of the evidence. Therefore, the court rules in defendant's favor on plaintiff's EPA claim and directs entry of final judgement against the plaintiff.

FINDINGS OF FACT

Because most of the findings of fact are undisputed and set forth in great detail in the court's earlier summary judgment decision, the court incorporates those findings and limits the additional findings of fact in this opinion to those necessary for context, in dispute at trial or otherwise deemed material to the court's conclusions of law that follow.

**A. Lochner's Pay History**

1. Plaintiff, Angela Lochner, is an employee in the classified civil service for the State of Wisconsin.

2. Lochner's Adjusted Continuous Service Date (also referred to as a "seniority date"), which marks the beginning of her continuous State employment, is January 13, 2014.

3. At that time, Lochner was hired as a new appointment to the Meat Safety Inspector Entry position in the Division of Food and Recreational Safety in DATCP, and she began her employment as a "Meat Safety Inspector."

2

4.     Lochner was later hired into the "Weights & Measures Petroleum Systems Specialist ("WMPSS") Entry" position effective November 1, 2015.

5.     Lochner's starting salary as a WMPSS Entry was $20.34 per hour, which was calculated in accordance with the State's 2015-2017 Comp plan, under section E 4.00(2) for non-broadbanding positions.   Specifically, section E 4.00(2) directs that the pay increase on promotion will be an amount equal to 8% of the applicable pay range minimum or the minimum of the pay range, whichever is greater.

6.     Since the appointment minimum for the WMPSS Entry position was $20.25. Lochner's new base pay rate was calculated by taking her current rate of pay as a Meat Safety Inspector Entry of $18.72, plus 8% of the appointment minimum for the WMPSS Entry position, which amounted to a $1.62 pay increase.

7.     Effective May 14, 2017, Lochner was reclassified from an Entry level WMPSS to a "Senior level WMPSS," with her salary increased to $21.88 per hour.

8.     However, because the pr raise for reclassification from entry to senior was $1.70, and the post-broadbanding raise was $1.54, DATCP Division of Trade & Consumer Protection requested and was granted permission to increase Lochner's existing salary by 12% of the new range minimum (instead of the standard 8%).

9.     As a result, Lochner's salary was further amended to $22.65, effective May 14, 2017, which was the highest salary that she could be paid under the State Comp Plan. Lochner then received three more general wage adjustments in February 2018, June 2018, and January 2019, ultimately raising her hourly pay rate to $24.35.

10.   On December 30, 2019, Lochner's salary went up to $26.41 per hour as part of a pay rate increase based on seniority.

11.   Lochner next received a January 5, 2020, across-the-board, general wage adjustment, bringing her base pay to $26.94 per hour.

12.   Finally, Lochner received the January 3, 2021, across-the-board, general wage adjustment, bringing her base pay to $27.48 per hour.

### B.   Findings Surrounding Broadbanding

#### 1.   State's Adoption of Broadbanding Program

13.   All State of Wisconsin employees entering the classified service are generally hired into a recognized position within a specific job classification with a set pay schedule and range.

14.   Starting in or around 2001, however, the State of Wisconsin implemented a program called "broadbanding" to allow agencies some flexibility in attracting new hires by offering a broader dollar range, rather than offering a single, rigid minimum rate.  In simple terms, broadbanding allows state agencies to pay new employees higher starting salaries where justified by relevant factors, including special need, private competition, and unique qualifications.

15.   Typically, broadbanding is achieved by collapsing a group of pay ranges into one "band."  For example, one pay band may include classified employees in the classification series 81-04. However, this one classification series may cover several, non-broadbanding pay steps or levels.

4

16.   With broadbanding, the steps within a classification series were abolished. For example, a classification series that formerly had multiple steps or levels (also sometimes called ranges) -- differentiated numerically (e.g., 1, 2, 3, etc.) or by skill level description (e.g., entry, objective, senior, and (at times) advanced -- no longer had steps.

17.   Before broadbanding, employees would typically obtain salary increases by "movement" to a higher level or step, whether by promotion, reclassification, reallocation, or other means.   After broadbanding, with fewer steps or levels within a class series, employees classification had fewer options for salary increases under the State's so-called "Comp Plan."

18.   Specifically, per Section I – 4.04(2)(a) of the Comp Plan, when a classification is broadbanded, the agency has the discretion to set starting salaries at "any rate that is not less than the minimum of the applicable pay range and not greater than the applicable appointment maximum."

19.   The upside of broadbanding is that it allows state agencies to better compete for talent with the private labor market by being able to offer a more competitive starting wage.

20.   The downside of broadbanding is that new employees can have starting salaries higher than substantially more senior employees or employees hired to the same position classification under the rigid minimum rate effective before the adoption of broadbanding.

21.   As a result, when broadbanding was adopted by the State for a job classification, pay compression typically resulted because:   newer staff are paid similar to or higher than long-term staff; and no mechanism within the state compensation system existed to go

back and re-set the salaries of all employees in the class, even if an employee was hired shortly before broadbanding went into effect for a specific classification.

22.   Thus, as broadbanding was implemented within state agencies, perceived pay inequities related to seniority caused many long-term employees to be upset.

23.   Not wanting to cause strife amongst long-term staff, managers of employees in some classifications did not want to implement broadbanding.

24.   Nevertheless, because of the classification recruitment and retention issues relating to the demands of the labor market and the need to attract top talent, many classifications were moved to broadbanding.

25.   Relatedly, the human resources staff provided consultation to division management on available tools that could be used to better compensate long-term staff in conjunction with broadbanding without causing greater pay inequities.

### 2.  DATCP's Implementation of Broadbanding

26.   DATCP particularly struggled attracting employees into the Weights & Measures classification, because of competition from municipalities paying higher salaries.

27.   The WMPSS classification implemented broadbanding in February 2016 to address this recruitment and retention challenge.

28.   As of February 6, 2016, the WMPSS classification had three permanent positions vacant and two Limited Term Employee ("LTE") positions vacant. Two of the three permanent positions had been vacant for over a month.

29.   As of February 20, 2016, all five of these vacant WMPSS positions continued to be vacant.  These enduring vacancies drove DATCP's decision to implement broadbanding

6

for WMPSS positions, including new hires who quickly leapfrogged more senior, existing employees in these positions.

### 3. WMPSS New Hires Post-Broadbanding

30. **Shawn Suri** was hired on April 4, 2016.  Suri was the first hire in the WMPSS position post broadbanding.  At the time he applied for the WMPSS position, Suri had already been certified as a Wisconsin Tank Inspector and had previous training and experience in Wisconsin and federal tank regulations.  Suri also had seven years' experience as a fuel specialist and compliance inspector for aboveground and underground storage tank systems.  Suri had four years' experience as a fuels journeyman with the US Air Force. Based on his previous training and experience, Alison Scherer, the HR Manager for DATCP from May 2015 through June 2019, approved Suri's starting pay rate of $24.00/hour.

31. **Edward Sindelar** has a seniority date of September 22, 2014.  He originally started in the State classified service as an Environmental Engineering Specialist Advanced 2 (pay schedule and range 14-13) at $32.50/hour, but transferred to WMPSS Entry on October 2, 2016.  Sindelar's pay rate was determined in accordance with the 2015-2017 Comp plan, Section I – 4.04(3)(a)(1).  With a salary range for his recruitment of $21.00 to $26.00/hour, DATCP's HR Manager Scherer approved Sindelar's starting pay rate of $27.00, which was ultimately a $5.50 per hour pay decrease from his previous position with the State.

32. **Michael Dailey** was hired as a WMPSS Entry with a starting date and seniority date of January 9, 2017.  Dailey had three years' experience in regulatory/enforcement fieldwork, including one year experience as a WMPSS LTE, performing technical

inspections.  Dailey had also successfully completed over 15 required trainings directly related to weights and measures inspections. The original hire recommendation from Division management was to pay Dailey $24.00/hour.  However, HR Manager Scherer emailed the Division Administrator at the time, Kelly Smithback, and indicated that Dailey's previous experience warranted going above the minimum pay rate posted of $21 per hour.  At the same time, Scherer did not believe Dailey should be brought in at the same rate as some of the other recent hires, such as Shawn Suri, who came in with more applicable work experience and now also had a similar amount of DATCP WMPSS training.  Plus, Suri also had several more years of relevant work experience before he came to DATCP.  Thus, Scherer recommended starting Dailey at $23.00/hour to provide some separation with Suri or others who may be hired with more years of applicable work experience. Division management agreed, and Dailey's starting pay rate was set at $23.00/hour.

33.  **Chad Brockman** was also hired as a WMPSS Entry with a starting seniority date of March 20, 2017.  Brockman had more than five years of relevant weights and measures experience and a bachelor's degree in a science field, along with two years of course work in chemical engineering.  Brockman's starting pay rate was set at $24.00.

34.  **Richard McCann** was previously employed in the State classified service with a seniority date of October 25, 1999.  McCann had previously been employed as a Weights and Measures Tech Specialist from October 25, 1999 to November 26, 2006. McCann then took a position as a Metrologist at DATCP from November 26, 2007 to April 16, 2017.  Paid $24.60 as a Metrologist immediately preceding his hire into the WMPSS Entry

8

position, McCann began in the WMPSS Entry position on April 16, 2017, with a starting pay rate of $26.50.

35. **Joel Burdick** was hired in the WMPSS classification on June 25, 2017.  That position had been posted for hire at a pay rate between $22.00 and $26.00/hour.  Burdick was previously employed as a Meat Safety Inspector Entry, providing him with experience with inspection procedures and documenting compliance issues, and he had a State service seniority date of August 10, 2015.  Having been promoted from a different class, his post-broadbanding available pay range per Section I 4.04(3)(b) of the Comp Plan was $20.26 to $35.44.  With a science and fire safety education background, Burdick's starting pay rate was $24.00 per hour.

36. **Jason Karczewski** was the next hire in the WMPSS Entry position with a start date of July 24, 2017.  The WMPSS position Karczewski applied for was posted with a starting pay rate of between $22.00 and $26.00/hour. Karczewski had a bachelor's degree in computer science and maintained the IT hardware for three retail locations for his current employer, both of which would be very beneficial during his training and employment as a WMPSS Entry.   Moreover, Karczewski had been the manager for Union Grove Auto Parts for 20 years, including managing pricing, sales, inventory, and point-of-sales computer systems for his current employer.  This work experience directly related to price verification (scanning) inspections conducted by WMPSS inspectors.  Finally, Karczewski had experience in customer service, working independently, and scheduling/time management, all important attributes for a State WMPSS inspector. Karczewski's starting pay rate was set at $24.00/hour.

37.   **Lance Smithey** was the next hire in the WMPSS Entry position, with a starting date and seniority date of April 30, 2018.  That position was posted for hire with a starting pay rate between $23.00 and $26.00/hour. Smithey had over four years of experience in the petroleum industry including meter testing and calibration, tank system tightness testing, cathodic protection testing, tank system functionality testing, and monthly facility inspection.  As such, Smithey was by far the most experienced candidate, and he had a relevant educational background with a criminal justice degree and hazardous material training. Smithey was hired with a starting pay rate of $25.00/hour.

38.   **Benjamin Clark** has a State service seniority date of December 22, 2013, and two years before he was hired as a WMPSS Entry, Clark worked at DATCP as a Meat Safety Inspector Entry and Objective levels.  Clark began as a WMPSS Entry on July 22, 2018, with a starting pay rate set at $24.75.

39.   **Anthony Hoffmann** was hired on August 6, 2018, and had been a weights and measures official for the previous five years.  As a result, Hoffmann had experience conducting all the major weights and measures inspections completed by state inspectors, including retail motor fuel devices, small capacity scales, Class II scales, package checking price verifications, timing devices, and vehicle tank meters.  His starting pay rate was set at $26.00 per hour.

40.   **Jacob Schaefer** was the next WMPSS Entry hire, beginning his permanent employment with DATCP on August 20, 2018.  Before this position, Schaefer had worked at DATCP as an LTE WMPSS inspector, which the Director of the Bureau of Weights and Measures, Rachelle (Shelly) Miller, believed put him a full year ahead of almost every other

10

candidate.  In addition, Schaefer had demonstrated a high level of autonomy in planning and performing his work with little oversight in a complex, technical field position.  The Bureau recommended, and HR approved, $24.50/hour for Schaefer's starting pay rate. Schaefer counter-offered with $25.50/hour. Alison Scherer approved an offer of $25.00, which Schafer accepted.

41.   **Daniel Lindert** was hired on September 4, 2018, for a position posted at a starting salary of $23.00 - $26.00.  His hiring justification noted he had worked more than 25 years in the aircraft maintenance field, which included relevant experience with storage tanks and scale verification. His starting pay rate was $24.25 per hour.

42.   **Travis Soper** was hired with a starting and seniority date of January 22, 2019. Soper had experience with scales, calibrations, tolerances, and devices that related to weights and measures that the other candidates did not possess.  Soper's references also stated that he is very reliable, capable of working independently and also a good leader. His hiring pay rate was set at $24.25.

43.   **Nicolas Eberle** began his career in Weights and Measures as an LTE first making $20.00/hour, then $20.75 and $21.17. He worked as an LTE WMPSS inspector for two years from February 2017 through April 2019, when he was hired into a permanent position on April 15, 2019.   That position was posted at a starting salary of $23.00 to $26.00, and given his experience, the Bureau requested that he be brough in at $26.00 per hour, but DATCP administrators pushed back and concluded that his pay rate should be on par with another LTE hire, Jacob Schaefer.  Eberle's hiring pay rate was $25.00 per hour.

44.  **Joel Uminski** was a permanent, classified State service hire in the WMPSS Entry position with a starting date and seniority date of August 19, 2019.  The position was posted at a starting rate between $23.00 and $26.00.  During his interview, Uminski rated the highest among the candidates for the position.  Moreover, Uminski was a 16-year veteran of the Sauk County Sheriff's Department, and his experience with enforcement and autonomy in the field stood out above the experience of other candidates; it also made him stand out overall above other candidates for the position.  Uminski's starting pay rate was set at $25.25.

45.  Finally, **Darren Leone** was hired as a WMPSS Entry with starting and seniority dates of September 3, 2019.  Leone was considered the best candidate for that position based on his work experience, education level, and communication skills, as well as demonstrated leadership in his past work experience.  Leone's past work also required mechanical aptitude, a skill that would be helpful to Leone as a WMPSS inspector.  Leone also had a college degree, while the other candidates did not attend college.  Leone also had experience managing operations at a manufacturing facility, including experience using scales and familiarity with the calibration.  Leone was hired at $25.00/hour.

### 4.  Post-Broadbanding Pay Discrepancies

46.  After adopting broadbanding, senior WMPSS employees experienced salary compression, including Lochner.  Specifically, as of February 18, 2018, all of the following employees hired pre-broadbanding had experienced salary compression even in relation to each other:

| Name | Seniority year | Hourly wage on 2-18-18 |
|---|---|---|
| Steven Hailer | 1999 | $24.41 |
| James Zorn | 2000 | $24.41 |
| Joseph Malek | 2002 | $24.41 |
| Jacques Daniel | 2005 | $23.65 |
| Joe Schreiber | 2008 | $23.18 |
| Kevin Mccarthy | 2011 | $22.99 |
| Nathan Torpen | 2011 | $22.99 |
| Mark Dequaine | 2013 | $22.73 |
| Angela Lochner | 2014 | $23.40 |
| Kent Stoddard | 2015 | $23.31 |

47.   More specifically, as of February 18, 2018, Lochner was earning more per hour than four of her male counterparts (Schreiber, McCarthy, Torpen, and Dequaine) despite their having between one and six more years of seniority than she.

48.   Post-broadbanding compression was even more pronounced for those brought on after broadbanding.  Indeed, of the post-broadbanding hires still employed on February 18, 2018, Dailey was earning $23.75 per hour; Burdick, Suri, Brockman, and Karczewski were earning $24.75 per hour; and Sindelar was earning $27.75 per hour.  This meant that of the new hires, all but one (Dailey) was making more than *every* pre-broadbanding employee, and as of February 18, 2018, even Dailey was already making more per hour than seven out of the ten more senior, comparable positions:

| Name | Seniority year | Hourly wage on 2-18-18 (or upon hire) |
|---|---|---|
| Richard McCann | 1999 | $26.50 |
| Benjamin Clark | 2013 | $24.75 |
| Edward Sindelar | 2014 | $27.75 |
| Shawn Suri | 2016 | $24.75 |
| Michael Dailey | 2017 | $23.75 |
| Chad Brockman | 2017 | $24.75 |
| Joel Burdick | 2017 | $24.75 |
| Jason Karczewski | 2017 | $24.75 |
| Lance Smithey | 2018 | $25.00 |

| Anthony Hoffmann | 2018 | $26.00 |
| Jacob Schaefer | 2018 | $25.00 |
| Daniel Lindert | 2018 | $24.25 |
| Travis Soper | 2019 | $24.25 |
| Nicolas Eberle | 2019 | $25.00 |
| Joel Uminski | 2019 | $25.25 |
| Darren Leone | 2019 | $25.00 |

### C. 2018 and 2019 Discretionary Equity or Retention Adjustments

49.  On April 12, 2018, DATCP Weights & Measures Field Supervisor, Stephen Peter, nominated Lochner and three others to receive a DERA.

50.  On May 9, 2018, DATCP submitted a request to the Department of Administration's Division of Personnel Management ("DPM") to increase Lochner's base-pay, DERA by $3.35, from $23.40/hour to $26.75/hour. The request to DPM explained:

> Due to the implementation of broadbanding in the Weights & Measures Petro. System Specialist series approximately 2 years ago, new hire rates of pay are exceeding that of previously hired and long term staff. The addition equity DERA for staff will allow the Weights & Measures Program to begin providing increased pay to longer term staff with more years of service, both within the state as well as within the program itself.

51.  On May 10, 2018, DATCP's HR Manager Scherer spoke with Rachel Martin from DPM about the DERA request for Lochner.  In particular, Martin expressed concern with the fact that Lochner only had four years of state service, yet DATCP was requesting a high DERA amount for her.  Indeed, the maximum amount that can be requested Within Range Pay Steps ("WRPS") per that fiscal year was 6, and Lochner's requested DERA of $3.35 graded out just short, at 5.78.

52.  On May 11, 2018, Scherer had another discussion with Lochner's division management and explained the potential areas of concern from DPM.   Division

14

management wanted to see where DPM landed on the DERA review and elected not to submit a back-up DERA request for another employee at that point.

53.   That same day, May 11, Scherer emailed Rachel Martin at DPM, summarizing her discussion with division management and asking that DPM make the decision on Lochner's DERA.   Scherer also provided some additional justification for Lochner's requested DERA, including that the division was fully aware Lochner would be moving ahead of staff with more years of state experience, but felt it was warranted based on overall pay inequities, as well as Lochner's high level of performance, which exceeded that of most other staff consistently.

54.   Nevertheless, DPM denied a DERA for Lochner, explaining that giving her a DERA would have made her salary higher than 13 other staff with more seniority than she, while only correcting inequities with respect to two other employees.

55.   At the same time, DPM approved DATCP's DERA requests for the two, other Weights & Measures employees, both of whom had more seniority than Lochner.

56.   *First*, Jonathan Petzold, a WMPSS Petroleum Inspector – Entry employee, whose seniority date is October 13, 2003, received a $3.48 DERA, changing his salary from $21.00/hour to $24.48/hour.

57.   While Petzold's start date as a WMPSS-Entry employee was October 18, 2015, about two weeks before Lochner's WMPSS-Entry start date of November 1, 2015, Petzold had worked as a State Correctional Officer, Recreation Leader, and Probation and Parole Agent before becoming a WMPSS-Entry employee on October 18, 2015.   Thus, his seniority date was effectively eleven *years* before Lochner's.

58.   Mover, Petzold's DERA justification narrative states, "Due to the implementation of broadbanding in the Weights & Measures Petro. System Specialist series approximately 2 years ago, new hire rates of pay are exceeding that of previously hired and long term staff. The additional equity DERA for staff will allow the Weights & Measures Program to begin providing increased pay to longer term staff with more years of service, both within the state as well as within the program itself."

59.   *Second,* Steven Hailer, a WMPSS Petroleum Inspector – Senior, whose seniority date is December 6, 1999 (and thus, fifteen years before Lochner), received a $2.09 DERA, changing his salary from $24.41/hour to $26.50/hour.  Both Hailer and Petzold's DERAs became effective May 13, 2018.

60.   On June 24, 2018, Lochner received a general wage adjustment of 2% to her base pay, which equaled $0.47 per hour.

61.   This general wage adjustment was in the 2017-2019 State Comp Plan, Section A, making it an across-the-board adjustment applicable to all permanent and project employees in classified service *not* covered by the public safety collective bargaining agreement.

62.   For obvious reasons, general wage increases based on a percentage of each employee's base salary widen existing disparities in salary, all other factors remaining the same.

63.   On January 6, 2019, Lochner received another general wage adjustment of 2% to her base pay, which equaled $0.48 per hour. (Scherer Decl. ¶ 52, Ex. 1027, Ex. 1044).

64.   This general wage adjustment was also part of the 2017-2019 Comp Plan going forward and across-the-board, again applying to all permanent and project employees in classified service not covered by the public safety collective bargaining agreement.

65.   On April 16, 2019, DATCP's HR Manager Scherer notified that agency's leadership that the Department of Administration ("DOA") would accept nominations for DERAs and Discretionary Merit Compensations ("DMCs"). However, DATCP was formally limited in the number of such awards it could request.  For DMCs, DATCP was granted 15% of eligible Full Time Equivalent ("FTE") employees, for a total of 95 DMCs and 5% of all broadbanding FTE positions for a total of 27 awards.  These caps applied to the entire agency, which for DATCP was approximately 625 to 650 employees at the time.

66.   The Comp Plan further provided that DERAs may be granted in an amount based on the fiscal year's WRPS, subject to the maximum of the pay range.

67.    To assist agencies in converting the WRPS to dollars, DPM provided a calculator with a set formula for a specific pay schedule and pay range.

68.   On April 17, 2019, Gregory Loreck, a Weights & Measures Petroleum System Supervisor, nominated Lochner for a $2.40 DERA or, in the alternative, a $2,000 DMC.

69.   On April 22, 2019, HR Manager Scherer met with DATCP's Administrator Lara Sutherlin and Bureau Director Rachelle Miller, as well as HR Program Officer Holly Weber, to discuss the plan for allocating DERAs, as well as to discuss an additional compensation adjustment proposal regarding the WMPSS classification and its numerous equity issues among the staff since the implementation of broadbanding for that position.

70.   At this meeting, the three individuals decided the DERAs would be requested for employees based on seniority consistent with the State's Compensation Plan guidelines and the basis for DERAs in 2018.

71.   After receiving recommendations from division administrators, HR and agency leadership had to determine for whom to submit DERA and DMC requests.   In the WMPSS classification, DERAs were submitted for eight employees, all of whom had more years of service and, therefore, greater inconsistencies compared to their salaries than Lochner.

72.   The chart below shows the names of the eight individuals in the WMPSS classification who received DERAs effective May 26, 2019, along with their seniority dates, hourly salaries and DERA amounts.

| Name | Seniority Date | Hourly wage | DERA amount | End wage |
|------|---------------|-------------|-------------|----------|
| Daniel, Jacques | 10/31/2005 | 24.62 | 2.40 | 27.02 |
| McCarthy, Kevin | 1/3/2011 | 23.92 | 2.40 | 26.32 |
| Malek, Joseph | 7/9/2001 | 25.40 | 2.40 | 27.80 |
| Petzold, Jonathan | 10/13/2003 | 27.08 | 0.72 | 27.80 |
| Saladino, Joseph | 12/8/2008 | 24.13 | 2.40 | 26.53 |
| Santroch, Wayne | 8/30/1993 | 27.76 | 0.65 | 28.41 |
| Torpen, Nathan | 5/9/2011 | 23.92 | 2.40 | 26.32 |
| Schreiber, Joe | 8/1/2008 | 24.13 | 2.40 | 26.53 |

73.   By comparison, as of April 2019, Lochner was making $24.35 per hour with a seniority date of 2014, which meant at that time Lochner's wage was:  (a) higher than

McCarthy's and Torpen's who had three more years seniority; and (b) higher than both Schreiber's and Saladino's, who had six more years seniority.

74.   In addition, Lochner's hourly wage was only $0.27 less than Daniel's, who had eleven more years of service than she, and the other WMPSS employees who received DERAs -- Petzold, Malek and Santroch -- had 11, 13, and 21 more years of service, respectively, than Lochner.

75.   Accordingly, had Lochner received a DERA instead of any one of the eight employees above, this would have created greater inequities compared to those employees based on seniority, which the DERAs were created to address.

76.   Based on merit, Lochner did receive a $2,000 DMC award on June 4, 2019, to at least make up some of the difference created by the DERAs, at least for that year.


OPINION

The Equal Pay Act prohibits employers from discriminating:

> between employees on the basis of sex by paying wages to employees . . . at a rate less than the rate at which [it] pays wages to employees of the opposite sex . . . for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.

29 U.S.C. § 206(d)(1).  In order to establish a *prima facie* cause of action under the Equal Pay Act, therefore, the employee "must demonstrate difference in pay for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." *Lauderdale v. Ill. Dept. of Human Servs.*, 876 F.3d 904, 907 (7th Cir. 2017) (internal quotation marks omitted) (citing *King v. Acosta*

*Sales & Mktg., Inc.*, 678 F.3d 470, 474 (7th Cir. 2012); 29 U.S.C. § 206(d)(1)).

Here, defendant concedes that plaintiff made a *prima facie* showing, having established that she was paid less than at least one man for the same work. (Def.'s Trial Br. (dkt. #36) 5.) As a result, the burden shifts to the employer to prove a neutral factor that explains the salary discrepancies. *Lauderdale*, 876 F.3d. at 908. Four neutral factors are set forth as affirmative defenses in the Act itself: "where . . . payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of product; or (iv) a differential based on any other factor other than sex." *Id*. (citing 29 U.S.C. § 206(d)(1)). The fourth affirmative defense "is a broad 'catch-all' exception and embraces an almost limitless number of factors, so long as they do not involve sex.'" *Reiff v. Bd. of Regents*, No. 13-cv-192-jdp, 2014 WL 4546041, *3 (W.D. Wis. Sep. 12, 2014) (quoting *Fallon v. Illinois*, 882 F.2d 1206, 1208 (7th Cir. 1989)). Ultimately, the Seventh Circuit "does not require that the factor other than sex be related to the requirements of the particular position in question, or that it be a 'business-related reason[]'"; instead, the question asked of the fourth defense is "whether the factor is discriminatorily applied or if it causes a discriminatory effect." *Fallon*, 882 F.2d at 1211. In addition, "[a]n employer's given explanation for a pay discrepancy must be supported by evidence that the employer *actually* relied on that reason." *Lauderdale*, 876 F.3d at 908 (citing *King*, 678 F.3d at 474) (emphasis added); *see Reiff*, 2014 WL 4546041, at *4 (requiring defendants to support the explanations for pay disparities "other than sex" with evidence).

As described above, as well as in the court's opinion and order on summary judgment, plaintiff asserts that defendant violated the EPA in three respects: (1) paying new, incoming employees higher wages after broadbanding was adopted; (2) DATCP's grant of Jonathon Petzold's DERA salary increase in 2018 at the same time that her request was denied; and (3) defendant's refusal to recommend her for a DERA in 2019. In response, defendant maintains that these actions were based on other factors than sex. The court will first address the alleged violation due to broadbanding, then address the remaining violations concerning DERA denials and addresses them together.

## I. Broadbanding

At summary judgment, the court declined to grant defendant's motion, finding that there were genuine issue of material fact as to whether: (1) taking advantage of broadbanding's increased flexibility -- and specifically, the ability to offer higher pay rates to fill open positions -- was actually required; and (2) whether the post-broadbanding hires warranted the higher pay rates. *First*, as detailed in the findings of facts above, defendant proved by a preponderance of the evidence that broadbanding was required in order to meet its ongoing recruitment needs during the relevant period. (Facts ¶¶ 29-33.) Indeed, the evidence established that even when broadbanding was used, DATCP required a case be made by the relevant division, as it did with Weights and Measures. Unlike many other State agencies, DATCP did not leap into broadbanding despite being encouraged to take advantage of that tool in a challenging employment market. In particular, DATCP provided contemporaneous proof considered by DATCP as to the difficulty Weights and Measures experienced in filling open WMPSS entry level positions under its then pay

21

structure by February of 2016, in large part because of competition from municipalities and the private sector also attempting to fill positions with similar or the same skillset *and* the ability to pay higher wages.  While DATCP was at the same time well aware of the downsides associated with broadbanding -- namely, pay compression and morale issues due to new employees having starting salaries higher than employees who have worked in the agency for much longer -- DATCP nonetheless determined that it was an appropriate business decision to adopt broadbanding for WMPSS positions given its recruiting needs. As the Seventh Circuit instructs, "[i]t is not [the court's] province to second-guess employers' business judgment."  *Fallon*, 882 F.2d at 1212); *King*, 678 F.3d at 473 ("[The Equal Pay Act [does not] require[] employers to ignore the compensation that workers could receive in other jobs, which in the language of the Equal Pay Act is a 'factor other than sex.'").  Even if the court were to engage in second-guessing with the benefit of hindsight, DATCP's demonstrated success in recruiting and filling the open WMPSS positions with exceptionally qualified recruits would appear to have vindicated DATSP's judgment.

*Second*, at summary judgment the court noted that while defendant provided information about eight of the eleven post-broadbanding hires that plaintiff identified as having a higher pay rate than she received, defendant had not yet described the relevant factors as to three of those individuals -- specifically, Suri, Karczewski and Uminski.  (Facts, *supra*, ¶¶ 30-45.)  At trial, however, defendant provided evidence that each of these three individuals (in addition to the eight others) had prior education, experience or training relevant to the WMPSS entry position to justify exercising the flexibility that

22

broadbanding allowed by offering higher, more competitive starting hourly rates ranging from $24.00 to $26.00 per hour.  Further, the evidence defendant provided at trial qualifies as exactly the kind of "documentation and communication" of compensation decisions made contemporaneously with recruitment and hiring of these individuals to warrant judgment in defendant's favor regarding DATCP's pay plan and budget considerations. *Lauderdale*, 876 F.3d at 908-09; *see also Reiff*, 2014 WL 4546041, at *4 (granting summary judgment to defendant where defendant "offered documented explanations for every pay adjustment received by Reiff and her comparators").

To be fair, given that Lochner was one of a very few women holding a WMPSS position *and* that all of the post-broadbanding hires were men, the court understands why Lochner perceived a gender imbalance in pay.  Nonetheless, as described at summary judgment and again above in detailed fact finding, senior male colleagues were impacted similarly or worse by broadbanding because of the pay compression that resulted.  (Facts ¶ 50.)  On this record, had Lochner been a man and everything else remained the same, neither Lochner's nor the new hires' starting salaries would have been different.  In other words, the court concludes that Lochner was treated exactly the same or better than her more senor, male employees, who all ended up earning less than the new hires despite their seniority because of DATCP's adoption of broadbanding.

## II. DERA Decisions

Recognizing the compression caused by the decision to adopt broadbanding, DATCP attempted to address the most egregious pay discrepancies based on seniority through DERA awards once empowered to do so by the State.  However, defendant

established at trial both that:  (1) there was a finite amount of money provided by the State for each agency to address seniority concerns through DERA awards; and (2) DATCP was required by DOA to grant these awards based on seniority and to consider the impact an award may have on entrenching inequity compared to others.

As set forth above, defendant established that Lochner was denied a DERA in 2018 because the requested increase of $3.35 base pay for Lochner by DPM because such an award would have made her salary higher than 13 other WMPSS staff with more seniority, while only correcting any inequity measured by seniority with respect to two other employees.  (Facts ¶¶ 55-58.) Moreover, defendant justified the fact that Petzold and another employee received DERAs in 2018 on the basis that both were substantially more senior than Lochner.  Even acknowledging that Petzold started around the same time as Lochner in the WMPSS role, he had eleven more years of seniority than she. Regardless, the record establishes that the DOA dictated that seniority be the driving consideration in deciding to award 2018 DERAs and that the two employees, both male, who received the award that year were more senior than Lochner *and* their awards did not create inequity in the same way an award to Lochner would have, at least based on seniority.

Similarly, the evidence is again fairly overwhelming that seniority drove the decision as to DERA awards in 2019.  (Facts ¶¶ 71-79.)  Once again, defendant DATCP nominated Lochner for a $2.40 DERA in 2019, *or* only in the alternative should DPM again refuse, at least a $2,000 DMC on merit.  While she was awarded the $2,000 DMC, DATCP ended up having to deny the DERA request because Lochner was again less senior and her pay rate was not as inequitable as the eight individuals who received DERAs in 2019 as set

24

forth in the table at Paragraph 72 above.  Indeed, before the DERA, Lochner was making $24.35 per hour, which was higher than four of her eight, more senior counterparts, and the other four individuals had double digit years of service greater than Lochner, and it was only after implementation of DERA awards required by the State, as implemented by DOA, to be driven by seniority that DATCP departed from a pay structure more favorable to plaintiff.

Accordingly, for both the 2018 and 2019 DERA decisions, the court finds that defendant has demonstrated by a preponderance of the evidence that DATCP's decision was based on a "factor other than sex." *Lauderdale*, 876 F.3d. at 908 (citing 29 U.S.C. § 206(d)(1)).

## ORDER

The court FINDS that defendant DATCP has demonstrated by a preponderance of the evidence its defense under 29 U.S.C. § 206(d)(1).  The clerk's office is directed to enter judgment in defendant's favor.

Entered this 15th day of August, 2022.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge